Margaret CIMINO, et al.

v.

YALE UNIVERSITY, et al.

Civ. No. N–84–666 (PCD).

United States District Court,
D. Connecticut.

June 30, 1986.

Kenneth J. Finger, Finger & Finger, White Plains, N.Y., for plaintiffs.

John R. FitzGerald, Noble K. Pierce, James M. Moher, Howard, Kohn, Sprague & FitzGerald, Hartford, Conn., for defendants Yale, Ryan, Kavanaugh, Festa, Dorfman, Cappiello and Jankowski.

W. Martyn Philpot, Jr., Carolyn W. Kone, Edward Mattison, Charles G. Albom, New Haven, Conn., for defendants City of New Haven, Farrell, Gill, O'Connor, Kendall, Harris, Stephenson, Dease, Gianotti, Zercie, Fonteyn and Garcia.

## RULING ON PENDING MOTIONS

DORSEY, District Judge.

### Background

Plaintiffs are suing for injuries sustained by Ms. Cimino while a spectator at the Harvard-Yale football game at the Yale Bowl on November 19, 1983. Ms. Cimino was seriously injured when she was struck

by a goalpost which was being pulled down at the conclusion of the game.

The first count charges that Yale University and the City of New Haven (and the sixty New Haven police officers who worked at the game) were negligent in failing to provide adequate crowd control and security and for agreeing in advance not to try to prevent the razing of the goalposts. The second count asserts that the conditions at the Yale Bowl resulted in the creation of a nuisance. The third and fourth counts, respectively, on behalf of the father and mother of Margaret Cimino, allege damages for time lost from their employment, for certain medical expenses incurred by Ms. Cimino and for the loss of services, society and companionship of their daughter. The fifth count seeks indemnity under Conn.Gen.Stat. § 7–465[1] from the City of New Haven for the conduct of its employees. The sixth count may be, and is, dismissed as moot, since the City of West Haven, along with defendant Ogden Security, Inc., has reached a settlement agreement with plaintiffs. In the seventh count of the complaint, plaintiffs invoke Conn.Gen.Stat. § 7–108 which purports to waive governmental immunity for the negligent failure of a municipality to suppress a mob, riotous assembly, or group engaged in disturbing the peace.

Pending are: (1) Yale University's motion to dismiss counts two, three and four; (2) New Haven's motion for summary judgment with respect to counts three and four; (3) Yale's motion to dismiss the cross-complaint in which the City of New Haven and the individual members of its police department seek indemnification against Yale; (4) cross-motions for summary judgment with respect to counts one, two, five, and seven of the complaint filed by plaintiffs and the City of New Haven; (5) New Haven's motion to have certain questions in the case certified to the Connecticut Supreme Court; and (6) plaintiffs' motion to revise the schedule for compliance with the court's trial preparation order.

### Discussion

#### (1) Yale's Motion to Dismiss Counts Two, Three and Four

Defendants contend that plaintiffs have no viable cause of action for public nuisance; that the parents have no cause of action for loss of consortium resulting from their daughter's injuries; and that the parents may not recover their own expenses, or loss of wages, attributable to their daughter's injuries. These arguments will be considered seriatim.

#### A. The Public Nuisance Claim

"Nuisances are public where they violate public rights ... that is, the rights enjoyed by citizens as part of the public." *Higgins v. Connecticut Light & Power Co.*, 129 Conn. 606, 611, 30 A.2d 388 (1943). Defendants assert that Ms. Cimino was not exercising a public right by attending the game.

The typical public nuisance action is brought against a municipality or other governmental entity and involves public areas such as thoroughfares, waterways or parks. *See, e.g., Laspino v. New Haven,* 135 Conn. 603, 67 A.2d 557 (1949) (waterway).

When it comes to *private* property,

One who enters premises at the express or implied invitation of a tenant does not come upon them in the exercise of any public right, but is there by reason of a right extended to him by the tenant; and, if injured, the visitor to the premises cannot base his right to recover upon the existence of a public nuisance.

---

1. Conn.Gen.Stat. § 7–465 provides in relevant part:

Any town, city or borough ... shall pay on behalf of any employee of such municipality ... all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for phys-

ical damages to person or property ... if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment....

*Webel v. Yale University,* 125 Conn. 515, 524–525, 7 A.2d 215 (1939). The same principles of law apply whether the defendant is the owner of the property or a tenant in possession. *Dahlstrom v. Roosevelt Mills, Inc.,* 27 Conn.Supp. 355, 357, 238 A.2d 431 (1967). An unguarded cable, which cut the leg of a child visiting an amusement park, was not a public nuisance. *Clark v. Pierce & Norton Co.,* 131 Conn. 499, 40 A.2d 752 (1945). Similarly, a patron who slipped in defendant's market could not claim public nuisance. *Hoffman v. Mohican Co.,* 136 Conn. 392, 71 A.2d 921 (1950). Public nuisance has been found inapplicable to an injury to a patron in defendant's restaurant, *LaPalme v. Tottle,* 16 Conn.Supp. 121 (1949); at defendant's bathing resort, *Arachy v. Schopen,* 22 Conn.Supp. 20, 158 A.2d 604 (1960); in defendant's store, *Dahlstrom;* and in defendant's parking garage, *Mulcahey v. ITT,* 31 Conn.Supp. 1, 318 A.2d 804 (1974).

The Yale Bowl is not alleged to be public property. That the public and Ms. Cimino, as she alleges, Complaint ¶¶ 8 and 9, are invited to view sports events there by purchasing tickets does not change the status of the property. "[M]embers of the general public were unquestionably welcome to enter ... and even solicited to do so[;] nevertheless they were not entitled to do so by virtue of any public right enjoyed by citizens as part of the public." *Dahlstrom,* 27 Conn.Supp. at 357, 238 A.2d 431. The status of the Yale Bowl as private property is determined as a question of law, as framed by the complaint, and is not a jury question.

Plaintiffs also claim that Conn. Gen.Stat. § 52–557h, which specifically provides liability "for injury suffered ... where the owner of land charges the person or persons who enter or go on the land for the recreational use thereof," expresses the legislature's intention to allow recovery for injury to paying users of recreational property. However, the type of recovery contemplated by the statute is that resulting from an action in negligence, not nuisance. Also, that statute is not broadly cast to embrace a claim by a spectator as opposed to one actively participating in recreational activity. Absent explicit statutory authorization, it would be improper to eliminate the public nuisance requirement that the public must have an unfettered right to go upon the property.

Accordingly, defendants' motion to dismiss the public nuisance claim is granted.

### B. *The Loss of Consortium Claim*

[4] Both sides agree that the Connecticut Supreme Court has not sustained a parental cause of action for the loss of consortium due to a child's injuries.

In *Taylor v. Keefe,* 134 Conn. 156, 56 A.2d 768 (1947), the Connecticut Supreme Court declined to recognize a child's cause of action for alienation of a parent's affection. The court expressly rejected the notion that modern conceptions of the family warranted creation of a legal right to intangible elements of affection, moral support and guidance in all family members. *Id.* at 161, 56 A.2d 768. Children have no valid cause of action for loss of consortium due to their mother's wrongful death. *Foran v. Carangelo,* 153 Conn. 356, 216 A.2d 638 (1966). These cases reflect a disinclination toward claims for loss of consortium. Indeed, only in 1979 was a cause of action for loss of spousal consortium due to personal injuries recognized. *Hopson v. St. Mary's Hosp.,* 176 Conn. 485, 408 A.2d 260 (1979).

A child's cause of action for loss of consortium resulting from a parent's injuries has been rejected in Connecticut's trial court. *See Hinde v. Butler,* 35 Conn.Supp. 292, 408 A.2d 668 (1979); *Reilly v. DiBianco,* Conn.L.Trib., Mar. 20, 1981 at 13 (Super.Ct. Feb. 17, 1981). "[C]onsortium is an element of a marital relationship and cannot be extended to the children of the marriage." *Hinde,* 35 Conn.Supp. at 296, 408 A.2d 668. Similarly, a parent's cause of action for loss of consortium resulting from a child's wrongful death has been rejected. *Shattuck v. Gulliver,* 40 Conn. Supp. 95, 99, 481 A.2d 1110 (1984) ("Although Connecticut has not yet addressed this precise issue, it appears that it would

follow the majority of jurisdictions in denying recovery of a parent's loss of an injured or deceased child's society, love, aid and companionship.").

The federal courts in Connecticut have followed the path staked out by the state courts. *See Clark v. Romeo,* 561 F.Supp. 1209 (D.Conn.1983) (no recovery by child for loss of consortium due to parent's wrongful death); *Thurman v. Torrington,* 11 Conn.L.Trib., July 8, 1985 at 7 (D.Conn. Jan. 2, 1985) (no recovery by child for loss of consortium due to negligent injuries to parent).

The majority of jurisdictions, including Connecticut, have held to "the view that a parent may not recover, from a third-party tortfeasor, as an element of damages for injury to his child, for loss of the child's society and companionship attributable to the injury." Annot., 69 A.L.R. 3d 553, 555 (1976).

Accordingly, defendants' motion to dismiss so much of the third and fourth counts of the complaint which assert claims for loss of consortium is granted.

### C. *Recovery of Expenses and Lost Earnings*

Defendants move to dismiss plaintiffs' claims for damages resulting from the parents' expenditures and lost earnings attributable to their daughter's injuries. Defendants contend that the expenses may only be recovered by a *minor's* parents,[2] and there is no dispute that Ms. Cimino is legally an adult. Plaintiffs contend that Ms. Cimino, though not a minor, is an unemancipated child and that there is no case or statutory authority preventing recovery for these damages.

■ Plaintiffs seek support in Conn.Gen. Stat. § 52–204 which provides that, if the parent of a plaintiff "has made or will be compelled to make expenditures" because of the injury to the plaintiff, "the amount of the expenditures ... may be recovered by the plaintiff." This statute, however, does not create a cause of action in the parent; it "merely provides a vehicle by which a plaintiff child can recover expenses incurred by his parents in lieu of that parent bringing a cause of action on his own behalf." *Savona v. GM,* 640 F.Supp. 6, 10 (D.Conn. 1985). Since § 52–204 does not create any new rights of recovery that did not already exist in the parent, *id.,* the burden is on plaintiff to establish another statutory or common law basis for asserting the right of a parent to recover expenses incurred as a result of injuries to a child who is not a minor.

■ Plaintiffs have not met that burden. The only relevant Connecticut cases which discuss the independent rights of parents to recover such expenses involved children who were not minors. *See, e.g., Krause v. Almor Homes, Inc.,* 147 Conn. 333, 160 A.2d 753 (1960); *Shiels v. Audette,* 119 Conn. at 77, 174 A. 323. Thus, Ms. Cimino can claim damages for expenses resulting from her injuries—even if paid by her parents—but her parents have not been shown to have an independent cause of action for those expenses.

Accordingly, defendants' motion to dismiss so much of counts three and four which assert claims for expenses incurred by Mr. and Mrs. Cimino is granted.

### (2) *New Haven's Motion for Summary Judgment With Respect to Counts Three and Four*

In light of the preceding ruling on Yale's motion to dismiss, New Haven's motion for summary judgment with respect to counts three and four is likewise granted.

### (3) *Yale's Motion to Dismiss the Cross-Complaint*

■ The City of New Haven and the sixty police officer defendants have filed a

---

2. When a minor child is injured by the negligent act of a third party, two causes of action immediately spring into existence; first, the right of action by the child itself for the personal injuries inflicted upon it; and second, a right of action to the parent for consequential damages, such as loss of services and expenses, caused by the injury to the child. *Shiels v. Audette,* 119 Conn. 75, 77, 174 A. 323 (1934).

cross-complaint against Yale University, seeking indemnification for any potential liability, on the ground that Yale's negligence "superceded [sic] any negligence or statutory or common law duties of these defendants with respect to the original plaintiffs and was the dominant cause of the latter's damage." Cross-complaint at 6. Yale moves to dismiss the cross-complaint pursuant to Fed.R.Civ.P. 12(b)(6).

It is well established under Connecticut law that there is no contribution among joint tortfeasors. *Caviote v. Shea*, 116 Conn. 569, 165 A. 788 (1933); *Rose v. Heisler*, 118 Conn. 632, 174 A. 66 (1934). *See Preferred Accident Ins. Co. v. Musante, Berman & Steinberg Co.*, 133 Conn. 536, 543, 52 A.2d 862 (1947) ("Where the negligence of each of two defendants enters immediately and directly into the production of the accident neither should have a right to contribution.").

However, an exception to this rule is that one tortfeasor may seek indemnification from another if the latter was "primarily" negligent and the former only "secondarily" negligent. *See Fidelity & Cas. Co. v. Jacob Ruppert, Inc.*, 135 Conn. 307, 63 A.2d 849 (1949). As explained in *Bailey v. Bussing*, 28 Conn. 455, 459 (1859), the court

> must look for personal participation, personal culpability, personal knowledge. If we do not find these circumstances, but perceive only a liability in the eye of the

law, growing out of a mere relation to the perpetrator of the wrong, the maxim of law that there is no contribution among wrongdoers is not to be applied.[3]

"An indemnitee may be chargeable with personal negligence, independent of any negligence of the indemnitor, and still not be chargeable with active or primary negligence. Personal independent negligence may be passive or secondary negligence. It need not necessarily be active or primary negligence." *Kaplan v. Merberg Wrecking Corp.*, 152 Conn. 405, 415, 207 A.2d 732 (1965). One seeking indemnity on the ground of "primary" negligence must show: (1) the indemnitor was negligent; (2) the indemnitor's negligence (rather than the indemnitee's) was the direct, immediate cause of the injury; (3) the indemnitor was in control of the situation to the exclusion of the indemnitee; (4) the indemnitee did not know of the indemnitor's negligence, had no reason to anticipate it, and could reasonably rely on the indemnitor not to be negligent. *Id.* at 416, 207 A.2d 732.

Yale's motion is predicated on the theory that, as a matter of law, the City of New Haven and the individual police officer defendants can satisfy neither the second nor third prongs of the *Kaplan* test. As to the second prong, Yale argues that the duties and responsibilities imposed by statute upon municipalities and their police departments[4] require a finding that the negligence of the cross-complainants, if any,

---

**3.** *See also Preferred Accident*, 133 Conn. at 542, 52 A.2d 862, quoting 38 A.L.R. 566:
> Where two parties are jointly liable in respect to a tort, one of them for the reason that he is the actual wrongdoer, and the other for the reason that the tort constituted a violation of a positive duty, the latter is entitled to recover from the former the amount which he has been compelled to pay as damages for the injury. The rationale of this rule is that the latter party is chargeable merely with "constructive fault" and is consequently not in pari delicto with the former.

**4.** Conn.Gen.Stat. § 7–108 provides:
> Each city and borough shall be liable for all injuries to person or property, including injuries causing death, when such injuries are caused by an act of violence of any person or persons while a member of, or acting in con-

cert with, any mob, riotous assembly or assembly of persons engaged in disturbing the public peace, if such city or borough, or the police ... have not exercised reasonable care or diligence in the prevention or suppression of such mob, riotous assembly or assembly engaged in disturbing the public peace.

Conn.Gen.Stat. § 7–284 as amended provides:
> When police protection is necessary or required at any boxing bout or wrestling match, place of public amusement, sport contest or hockey, baseball or basketball game, or any other exhibition or contest, which is being held or is to be held in any municipality, the amount of such protection necessary shall be determined and shall be furnished by (1) the chief or superintendent of the police department in any municipality having an organized or paid police department....

was active rather than passive—direct and immediate rather than secondary and attenuated.[5] These same statutory duties and responsibilities are also alleged to foreclose meeting the third prong of the test because they make it impossible for cross-complainants to establish that the situation at the Yale Bowl on the day plaintiff sustained her injuries was controlled by Yale to the exclusion of the City and the police.[6]

In resolving this motion, all facts pleaded in the cross-complaint must be accepted as true and construed in the light most favorable to the nonmoving party. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The cross-complaint may not be dismissed "unless it appears beyond doubt" that the cross-complainant "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Thus, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 at 236, 94 S.Ct. at 1686.

The cross-complaint as amended alleges that Yale was primarily negligent because its actions were the direct, immediate cause of plaintiff's injuries and it had exclusive control over the situation at the Yale Bowl. More specifically, cross-complainants allege that Yale was primarily negligent in that it failed to broadcast warnings to spectators to stay away from the field; it seated spectators on the field in close proximity to the goalposts; and it failed to use Yale's security force to prevent spectators from entering the field.

The cross-claim must be construed against the background of the complaint, for it is only if the plaintiffs prevail against the City and its police officers that they would have any basis to seek indemnity against Yale. Further, it is only on grounds alleged against New Haven and its police that plaintiffs could prevail against them. From the complaint, it is plaintiffs' claim that:

(a) Yale hired or contracted with the New Haven Police Department to provide security and crowd protection/control. Complaint, ¶ 25.

(b) Yale agreed, in advance, with New Haven and its police officers that the goalposts would not be protected. Complaint, ¶ 26.

(c) The City of New Haven, by its relationship to the Yale Bowl and by contract, was in charge of security and crowd control at the Yale Bowl. Complaint, ¶¶ 35–42.

(d) New Haven's liability derives from:

(1) an agreement allowing the goalposts to be pulled down;

(2) its obligation to protect plaintiff and others similarly situated;

(3) its undertaking to provide adequate, trained and organized personnel;

(4) its duty to plan for foreseeable contingencies such as the circumstances of plaintiff's injury;

(5) its duty to respond, react, prevent, stop and suppress the conduct of those

---

5. These statutes [Conn.Gen.Stat. §§ 7–108, 7–284] impose a duty to undertake affirmative acts.... If they [cross-complainants] did not act reasonably, their failure to do so constitutes negligence that directly and immediately entered into the injury. If they did act reasonably, they will not be in violation of the statutes and will not be liable for their breach. There is no room for a claim that the statute was violated but that this violation was not a direct and immediate cause of the injury, yet still subjects the cross-complainants [sic] to liability for which they are in need of indemnification.

Yale University's Memorandum of Law in Support of Motion to Dismiss ("Yale's Memorandum") at 10.

6. The statutes do not say that a municipality must suppress riots and provide police protection at sporting events only when someone else lets it. There is a strong argument that a municipality could not be excluded from control as a matter of law based on its duties to keep the peace as imposed by these statutes. Indeed, the cross-complainants could have shut down the event entirely had they determined it to be an uncontrollable hazard to public safety.

Yale's Memorandum at 11.

present, in relation to the goalposts by which plaintiff was injured;

(6) its duty to provide equipment to protect against and prevent the conduct of others which resulted in the injury to plaintiff;

and constituted negligence on its part and those of its agents, servants and employees.

If New Haven were held liable on any one of the foregoing bases, it could not meet the standards of indemnification. If New Haven were held liable on one or more of the bases alleged against it in the complaint, any such negligence as then would have been found would not permit a finding of either the second or third factors of the four criteria of *Kaplan* referred to above. New Haven, under the allegations against it, would thus have been held to have been the direct, immediate cause of the injury; such a finding for the plaintiffs also could not be reconciled with a claim that Yale, to the exclusion of New Haven, was in control of the situation at the Yale Bowl. In effect, in any way plaintiffs prevail against New Haven and its police officers, the latter could not be found thereafter to have established either the second or the third elements of a primary/secondary tortfeasance relationship to Yale.

■ Allegations of a conclusory nature do not suffice to establish a claim in opposition to specific contradicting allegations. Thus, while on their face, the allegations of the cross-complaint do sufficiently invoke the principles of *Kaplan*, they do so in a conclusory form which is at odds with the complaint against those seeking indemnity. The cross-claim stands as of the time when those seeking indemnity have sustained the

loss for which indemnity is sought. Theirs is a contingent claim: if plaintiffs do not prevail against them, then no basis for indemnity lies. If plaintiffs do prevail against them on any basis alleged in the complaint, they would have been held liable on a basis which precludes a finding that Yale's fault and not theirs was the direct immediate cause of the injury or that Yale was exclusively in control of the situation by which plaintiff came to be injured. A party seeking indemnity cannot escape the position he would necessarily be in if liability is imposed upon him by alleging, conclusorily, that it is something else.

Thus, although the indemnity allegations would ordinarily present questions of fact, that is precluded here, as it is clear that any basis on which the indemnitees might have been held liable precludes a finding of the elements essential to indemnity.

Accordingly, the cross-claim against Yale is dismissed.

### (4) *Cross-Motions for Summary Judgment*

■ The City of New Haven asserts that the doctrine of sovereign immunity as set out in *Shore v. Stonington*, 187 Conn. 147, 444 A.2d 1379 (1982), requires granting its motion for summary judgment. Plaintiffs claim that *Shore v. Stonington*, when read in conjunction with *Sestito v. Groton*, 178 Conn. 520, 423 A.2d 165 (1979) [7], requires denying the City's motion and granting plaintiffs' cross-motion for summary judgment.

In *Shore*, plaintiff's decedent was killed in an automobile accident caused by a drunk driver travelling at a high rate of

---

**7.** The City of New Haven omitted any reference to *Sestito* in its memorandum, despite the fact that *Sestito* is a leading Connecticut case on the issues raised by the motion and is discussed at some length in *Shore v. Stonington*, upon which the City heavily relies. Moreover, in another part of its memorandum the City represents to the court that the rule in *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969), ought to be followed, yet failed to inform the court that that case was specifically overruled in *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597 (1982).

The court is unable to discern whether sloppy research or warped advocacy tactics are responsible for these errors of omission, but the Corporation Counsel is admonished that diligent research, which includes Shepardizing cases, is a professional responsibility, *see Taylor v. Belger Cartage Service, Inc.*, 102 F.R.D. 172 (W.D.Mo. 1984), and that officers of the court are obliged to bring to its attention all important cases bearing on the matter at hand, including those which cut against their position. *See* Model Rules of Professional Conduct, Rule 3.3(a)(3).

speed who shortly before had been stopped but not arrested by a town police officer. The officer advised the driver to slow down and to let his girlfriend do the driving, but had not removed the driver from the road. The court ruled that whether the police officer owed a duty to plaintiff's decedent was a question of law, not fact, and that the answer to the question turned on the nature of the officer's responsibilities:

> [I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance must be a public and not an individual injury, and must be redressed, if at all[,] in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it or to perform it properly, is an individual wrong, and may support an individual action for damages.

187 Conn. at 152, 444 A.2d 1379, quoting *Leger v. Kelley,* 142 Conn. 585, 589–590, 116 A.2d 429 (1955).[8] The Court concluded that the laws against speeding and drunk driving gave the officer *discretion* either to warn the driver or to remove him from the road and that the officer's judgment in such a situation is not subject to review: "We do not think that the public interest is served by allowing a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's discretionary professional duty. Such discretion is no discretion at all." 187 Conn. at 157, 444 A.2d 1379.

The City argues that the number of officers it assigned to the Yale Bowl, how they were deployed, and what instructions they were given, are all matters of discretion exercised in the performance of public governmental functions. *See* Brief of Defendant City of New Haven at 9–10; *see also Westminster Investing Corp. v. G.C. Murphy Co.,* 296 F.Supp. 1300, 1301 (D.D.C.

1969) ("[T]he broad policy decision which led to the deployment of groups of policemen in an effort to maintain law and order throughout the area and the instructions issued to them are discretionary and not ministerial. They do not give rise to civil liability, even if as a consequence thereof, plaintiff's property sustained damage through negligence.").

■ The City's statement of the law is sound as far as it goes, but it does not go far enough. For example, the court in *Shore* recognized various exceptions to the general rule of sovereign immunity which permit suits against officials for breach of duty "without regard to whether the duty is technically a public or private one." 187 Conn. at 153, 444 A.2d 1379. Thus, even where the duty of an official is not ministerial but involves the exercise of discretion, he or she is subject to liability if "the duty to act is clear and unequivocal," such as when a failure to act "would be likely to subject an identifiable person to imminent harm." *Id.*

The court illustrated this principle by reference to *Sestito,* 178 Conn. 520, 423 A.2d 165, which involved a police officer patrolling in a squad car who witnessed a group of at least seven men drinking beer in a parking lot adjacent to a restaurant and bar. As the officer drew alongside the group, he saw that an argument had broken out between a member of the group and one of two individuals who had just emerged from the restaurant; there was shouting and shoving and the officer observed four of the men "scuffling and punching." *Id.* at 523, 423 A.2d 165. The officer did not stop and one of the men was shortly thereafter shot and killed during the fight. The trial court directed a verdict for the town of Groton in the action brought by the administratrix of the estate of the man who had died, but the Connecticut Supreme Court reversed. "The ques-

---

**8.** *But see* 2 *Restatement (Second) Torts* § 324A (rejecting the public/private duty distinction). Several jurisdictions have followed the Restatement. *See, e.g., Ryan v. State,* 134 Ariz. 308, 656 P.2d 597 (1982) ("We shall no longer engage in the speculative exercise of determining whether the tort-feasor has a general duty to the injured party, which spells no recovery, or if he had a specific individual duty which means recovery.... Thus the parameters of duty owed by the state will ordinarily be coextensive with those owed by others.").

tion in each case," the higher court observed, "is whether the facts present a situation where ... a public official's constant general duty to the public has, in addition, subsumed a specific duty to the individual claiming injury." *Id.* at 528, 423 A.2d 165. The court concluded that a directed verdict was inappropriate since "[e]ven as a matter of common law negligence," a jury could have found that the defendant police officer "had a duty to the decedent to act as a skilled policeman under the circumstances, and breached that duty." *Id.; see Thurman v. Torrington,* 595 F.Supp. 1521, 1527 (D.Conn.1984).

■ The facts of the incident at the Yale Bowl more closely resemble the situation in *Sestito* than in *Shore.* The police officer in *Shore* had no idea who, if anyone, might be victimized as he might reasonably have assumed that the drunk driver would not continue to operate his vehicle, whereas the police officers at the Yale Bowl, like the officer in *Sestito,* were dealing with a specific group of people who were then endangering individuals within the officers' line of sight.[9] There is also authority for the proposition that, where a city contracts for a price [10] to provide security, spectator protection and crowd control at a particular event, the city thereby assumes a common law duty that transcends its general duty to the public and becomes a specific duty owed to each and every individual who purchases a ticket and attends that event. *See Comastro v. Rosemont,* 122 Ill.App.3d 405, 78 Ill.Dec. 32, 461 N.E.2d 616 (1984). Accordingly, there is sufficient evidence in the instant case and sufficient legal precedent to warrant the conclusion that whether the police owed a common law duty to Margaret Cimino under the precise circumstances as they existed at the Yale Bowl on November 18, 1983, is a question for the jury to decide and not, therefore, resolvable on cross-motions for summary judgment.

■ Beyond common law negligence claims, plaintiffs also have a *statutory* basis for their suit in Conn.Gen.Stat. § 7–108.[11] In *Shore,* the court recognized that where a statute specifically provides for a cause of action against an official or municipality for failure to enforce certain laws, the argument for sovereign immunity loses much of its force. *See* 187 Conn. at 154, 444 A.2d 1379. Indeed, *Shore* distinguished *Sestito* partly on the ground that the latter case involved § 7–108 which "specifically enjoins police officers to suppress riotous assemblies [and mobs; and groups engaged in disturbing the peace] and holds the city ... liable for all injuries suffered for failure of the officers to exercise reasonable care." *Id.* at 154–155, 444 A.2d 1379. In *Sestito,* the court observed that § 7–108 "is a legislative waiver of sovereign immunity, and therefore must be read narrowly"; the court concluded that because the activities of the men in the parking lot could have been found by a jury to have constituted a "disturbance of the peace" (if not a "mob" or "riot"), it was error to prevent the jury from engaging in that inquiry. 178 Conn. at 524, 525, 423 A.2d 165. Thus, the lesson from *Sestito,* as explicated by *Shore,* is that, where suit is brought pursuant to § 7–108, and there is some credible basis for believing that the activities in question involve a mob, riot, or assembly of persons engaged in disturbing the peace, it is error to find as a matter of law that sovereign immunity precludes a determination by the jury of the relevant issues. Since, in the instant case, a jury could reasonably find that the crowd which attacked the goalposts at the Yale Bowl was a "mob, ... riotous assembly or assembly engaged in disturbing the public

9. One high-ranking police official who was present on the playing field following the game has stated: "I can recall the goal post swaying towards the crowd and I couldn't believe the kids could still stay there because they were the ones that were taking it down. They were kind of representing a threat to themselves." Affidavit of Captain James Gill at 4.

10. Yale reimbursed the City for the salaries paid to the police officers who worked the game, as provided in Conn.Gen.Stat. § 7–284, and the City also tacked on 5% to the bill for "administrative" costs.

11. *See* note 4, *supra.*

peace," the jury and not this court should determine whether the City failed to protect Ms. Cimino within the purview of § 7–108.[12]

■ Finally, even if plaintiffs come under *none* of the common law or statutory exceptions to the traditional rule permitting recovery only where violation of a ministerial duty is established, summary judgment in favor of either party would still be inappropriate. There are aspects of this case, for example, which place in dispute whether the New Haven defendants, or some of them, did in fact breach ministerial duties owed to the spectators at the Yale Bowl. Accepting the City's contention that formulating the number, location and tactics of the police officers assigned to the game involved a quasi-judicial exercise of judgment, there is evidence in the record that individual police officers may have failed to give effect to the plans which had been developed.

The police captain in charge of pre-game preparation stated that he assigned "9 or 10 policemen at each goalpost" who were instructed to use "passive deterrence"—"having some police stand proximate to the goalposts and verbally [try] to fend off the attacking crowd"—before permitting the goalposts to be demolished. Affidavit of John O'Connor at 2, 4. The police captain in charge of the officers who worked inside the Yale Bowl on November 19, 1983, stated that 8 to 10 policemen "generally" go the base of a goalpost following a game and that there "should have been" 11 police officers at each goalpost after the particular event in question; the officers were to

make "an initial effort ... short of physical force" to discourage the destruction of the goalposts. Affidavit of James Gill at 2, 3.

Plaintiffs assert that these assignments and instructions were not properly executed:

> Captain Gill, using the 20 to 21 men available for duty on the field after the game, stated that he assigned, not the eleven (11) as required, but 9 to 10 officers to each goalpost. In fact it turns out that of the 9 to 10 men he stated that he assigned to the north goalpost, at least six were assigned elsewhere.... Even a cursory inspection of the picture taken of the north goalpost at the time the game ended, shows only four police officers within 30 yards of the goalpost, ... and none of them were [sic] "around," "forming a semi-circle," "surrounding," or "at the base of" the north goalpost [as per their plan and/or their instructions]. In fact, two of the officers Gill said he assigned to the north goalpost were not even inside the Bowl, and at least three others were stationed at the 50–yard line. Of the three police officers who can be seen in the north end zone area, one officer was about 10 yards from the goalpost and two others were assigned or were farther away. The four officers (including Gill) who were so located were at least 10 to 30 yards from the north goalpost at the time the game ended and did nothing more than watch the crowd rush onto the field and go to the goalpost, pull on, jump on and eventually tear down and

---

12. The City's attack on plaintiffs' statutory cause of action is based on the contention that plaintiffs failed to satisfy the notice requirement of § 7–108. Under said provision,

[a]ny person claiming damages under this section from any city or borough shall give written notice to the clerk of the city or borough of such claim and of the injury upon which such claim is based, containing a general description of such injury and of the time, place and cause of its occurrence, within thirty days of such injury....

It is uncontested that the City of New Haven had actual notice of the injury inasmuch as the police department began its own investigation immediately following the accident. It is also uncontested that plaintiffs wrote to the police department, though not the clerk's office, within thirty days of the incident, and that the letter alluded to the time, place and cause of the injury, but not its extent. A more formal and detailed notice of claim was served on the proper party within 120 days of the accident. Under these circumstances, the adequacy of the original notice is a question for the jury, *see Fraser v. Henninger,* 173 Conn. 52, 376 A.2d 406 (1971), and, if deemed insufficient, the court will determine whether the later notice was sufficient to satisfy the statutory requirements.

demolish the north goalpost. The officers did not make any attempt to stop the crowd before it got to the north goalpost or after.

Brief on Behalf of Plaintiffs at 4–5.

Because plaintiffs have made a sufficient showing that material facts are in dispute as to whether some or all of the defendants may have breached ministerial as well as discretionary duties, the City's motion for summary judgment, to the extent that it is based on traditional common law theories of sovereign immunity, is denied. And since the jury must determine whether the activities in question were discretionary or ministerial, plaintiffs' cross-motion for summary judgment is also denied.

(5) *New Haven's Motion to Certify Questions to the Connecticut Supreme Court*

In light of the preceding ruling, the motion to certify various questions to the Connecticut Supreme Court is denied as moot.

(6) *Plaintiffs' Motion to Revise the Schedule for Compliance with the Trial Preparation Order*

Plaintiffs' motion is granted. The revised dates for compliance with the court's trial preparation order are as follows:

Section A:     July 18, 1986
Section B:     August 1, 1986
Section D:     August 15, 1986

SO ORDERED.